UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

STUDENT X, by his mother,

**MEMORANDUM & ORDER**

07-CV-2316 (NGG) (RER)

Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

Defendant.
------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff, the mother of Student X, a minor child, brings this action against Defendant,

New York City Department of Education, pursuant to the Individuals with Disabilities Education

Improvement Act ("IDEIA"),[1] 20 U.S.C. § 1400 et seq., and Section 4404 of the New York State

Education Law. Plaintiff appeals an administrative decision holding that Student X's March

2006 Individualized Education Plan ("IEP") was reasonably calculated to provide Student X with

a free appropriate public education, despite its failure to include previously provided at-home

educational services. Plaintiff moves for modified *de novo* review of the administrative decision

and, pursuant to the IDEIA's pendency provision, seeks injunctive, declaratory, and

compensatory relief regarding the at-home services that she contends were unlawfully

terminated. (Docket #15.) Defendant has cross-moved for summary judgment, contending that

---

[1] In 2004, Congress reauthorized the Individuals with Disabilities Education Act ("IDEA") as the IDEIA. See Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), effective July 1, 2005. Throughout this opinion, statutory references will be to the IDEIA, except when quoted in opinions as the IDEA.

the administrative decision should not be reversed, that Plaintiff's case is moot, and that Plaintiff is not entitled to the requested injunctive and declaratory relief. (Docket #21.) For the reasons that follow, the court grants in part and denies in part Plaintiff's and Defendant's cross-motions. The court finds that 1) the March IEP is not moot; 2) the March IEP is substantively adequate to provide Student X with a free appropriate public education under the IDEIA; 3) Student X's pendency placement when this lawsuit commenced was determined by the unappealed decision of the Impartial Hearing Officer in 2005; 4) Student X's pendency placement changed on March 31, 2008, when Plaintiff failed to seek judicial review of a subsequent administrative decision of the State Review Officer; 5) Defendant violated the pendency provisions of the IDEIA and New York Education Law by unlawfully terminating Student X's at-home services, which should have been provided until March 31, 2008; 6) Student X is entitled to compensatory education for the at-home services he should have received from March 1, 2007 to March 31, 2008; and 7) Plaintiff's success on the pendency and compensatory education claims makes her the prevailing party for the purpose of partial attorneys' fees.

## I.      STATUTORY FRAMEWORK AND STANDARD OF REVIEW

### A.  The IDEIA

The IDEA, reauthorized as the IDEIA, "is the most recent Congressional enactment in 'an ambitious federal effort to promote the education of handicapped children.'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 179 (1982)). Under the IDEIA, states receiving federal funds are required to provide "all children with disabilities" a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); Rowley, 458 U.S. at 180-81. To meet these requirements, a school district must provide "special education and related services tailored to

meet the unique needs of a particular child" that are "reasonably calculated to enable the child to receive educational benefits."  Walczak, 142 F.3d at 122 (quoting Rowley, 458 U.S. at 207).

These services are administered pursuant to an Individual Education Plan ("IEP"), which a school district must provide annually.  20 U.S.C. § 1414(d).  The "result of collaborations between parents, educators, and representatives of the school district," the IEP is the "'centerpiece' of the IDEA's education delivery system.'"  Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)).  For each child with disabilities, a school district is required to generate an IEP that "must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  Schaffer v. Weast, 546 U.S. 49, 53 (2005); 20 U.S.C. § 1414(d)(1)(A).

While IEPs are subject to numerous procedural and substantive requirements, "the IDEA itself does not itself articulate any specific level of educational benefits that must be provided through an IEP."  Walczak, 142 F.3d at 130.  The case law, however, makes clear that school districts are not required to "furnish . . . every special service necessary to maximize each handicapped child's potential."  Rowley, 458 U.S. at 199.  "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'"  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (quoting Walczak, 142 F.3d at 130).

The IDEIA "provides a variety of 'procedural safeguards with respect to the provision of free appropriate public education' by school districts."  Mackey v. Bd. of Educ., 386 F.3d 158, 160 (2d Cir. 2004) (quoting 20 U.S.C. § 1415(a)).  New York has designated responsibility for

developing appropriate IEPs to local Committees on Special Education ("CSEs") appointed by

school districts.  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007).  In

compliance with the IDEIA's requirements, New York has implemented a "two-tier system of

administrative review."  Mackey, 386 F.3d at 160 (citation omitted).  Under New York law,

parents who are dissatisfied with a proposed IEP may request, pursuant to IDEIA-mandated

procedures, to have it reviewed before an impartial hearing officer ("IHO") appointed by the

board of education.  N.Y. Educ. Law § 4404(1) (McKinney 2001 & 2008 Cumulative Pocket

Part); see generally 20 U.S.C. § 1415(f) (describing requirements for impartial due process

hearing).  Following the decision from that hearing, an aggrieved party may appeal to a State

Review Officer ("SRO").  N.Y. Educ. Law § 4404(2); see generally 20 U.S.C. § 1415(g)

(describing requirements for appeal to state agency).  The IDEIA expressly provides that "any

party aggrieved" by the final state decision "shall have the right to bring a civil action"

challenging the decision in state or federal court.  20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law §

4404(3).  Pursuant to the Supreme Court's decision in Schaffer v. Weast, the burden of

persuasion is on the party challenging the adequacy of the IEP in the administrative proceedings,

in this case, the Plaintiff.  546 U.S. at 57-58.[2]

The IDEIA also contains a "stay-put" provision, 20 U.S.C. § 1415(j), which provides that

"during the pendency of any proceedings conducted pursuant to this section, unless the State or

local educational agency and the parents otherwise agree, the child shall remain in the then-

current educational placement of such child."  See also Mackey, 386 F.3d at 163 (discussing

---

[2] Effective October 14, 2007, after the administrative proceedings were completed in this case, New York's
Education Law was amended to shift the burden of persuasion back to the school district in an impartial hearing,
except in cases where the parents seek tuition reimbursement for a unilateral private placement.  See N.Y. Educ.
Law § 4404(1)(c) (McKinney 2001 & 2008 Cumulative Pocket Part).

IDEA's "stay-put" provision); 34 C.F.R. § 300.518(a) (2007); N.Y. Educ. Law § 4404(4)(a) (McKinney 2001 & 2008 Cumulative Pocket Part).

### B. Federal Judicial Review under the IDEIA

IDEIA actions in federal court are often resolved by summary judgment motions. <u>See</u>, <u>e.g.</u>, <u>P.K. v. Bedford Cent. Sch. Dist.</u>, --- F. Supp. 2d  ---, 2008 WL 2986408, at *9 (S.D.N.Y. Aug. 1, 2008).  An IDEIA action, however, differs from an ordinary summary judgment in that the existence of a disputed issue of fact will not defeat the motion.  <u>Id</u>.  Instead, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i); <u>see</u> <u>also</u> <u>Gagliardo</u>, 489 F.3d at 112 (stating that federal courts "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence'") (citation omitted).  The summary judgment motion "serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  <u>Lillbask v. Conn. Dep't of Educ.</u>, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citations omitted).

The standard by which a district court reviews the final determination of the SRO has been characterized as "modified *de novo* review."  <u>C.B. v. New York City Dep't of Educ.</u>, 2005 WL 1388964, at *12 (E.D.N.Y.  June 10, 2005).  The district court must conduct an independent review of the record for "objective evidence" that indicates "whether the child is likely to make progress or regress under the proposed plan."  <u>Gagliardo</u>, 489 F.3d at 113.  At the same time, the role of the district court in reviewing state decisions under IDEIA is "circumscribed."  <u>Id</u>. at 112

(citation omitted).  The "independent" review of the state administrative decision is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at 206.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  Walczak, 142 F.3d at 129 (internal quotations marks and citations omitted).  Courts must show "substantial deference to state administrative bodies on matters of educational policy," Cerra, 427 F.3d at 191, particularly where the SRO's review has been "thorough and careful," Walczak, 142 F.3d at 129.  This "due weight" is not implicated with respect to issues of law, such as "the proper interpretation of the federal statute and its requirements."  Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The administrative record and exhibits submitted by the parties reveal the following factual background.[3]  Student X, who is eleven years old, has diagnoses of autism, pervasive developmental disorder, tuberous sclerosis, and refractory medical epilepsy.  He has many delays in gross motor, fine motor, visual perceptual, and cognitive skills, as well as delays in balance and coordination, sensory processing skills, and socialization.  (IHO Hr'g Ex. B at 5 (IEP Mar. 21, 2006) ("March IEP").)

---

[3] Pursuant to the IDEIA's requirement that a reviewing court "shall hear additional evidence at the request of a party," 20 U.S.C. § 1415(i)(2)(C)(ii), the court has considered exhibits offered by the parties, with one exception. Defendant opposes Plaintiff's request that the court consider an article published in the Wall Street Journal entitled "Staying the Course: Schools Beat Back Demands for Special-Ed Services" on the grounds that the article constitutes inadmissible hearsay.  (Def. Mem. 2 n.1, Docket #28) (citing A.D. & H.D. v. New York City Dep't of Educ., No. 06-cv-8306 (BSJ) (S.D.N.Y. Apr. 21, 2008) (excluding same article as inadmissible hearsay under Fed. R. Evid. 802).)  The article contains complaints, allegations, and opinions about the SRO in this case; these are out-of-court statements offered as proof that the SRO is biased. Accordingly, the court finds that the article constitutes inadmissible hearsay under Fed. R. Evid. 802.

Student X has been receiving special education services provided by the New York Department of Education since he was twelve months old.  (Tr. IHO Hr'g 72.)  At age two, pursuant to the Department's Early Intervention program, he was receiving thirty hours per week of at-home services, consisting of fifteen hours of speech and language therapy and fifteen hours of Applied Behavioral Analysis ("ABA") per week.  (Id.)  When he was four years old, Student X began attending a state-approved private preschool and continued to receive additional at-home services of five hours of speech and language therapy and ten hours of ABA per week.  (Id. at 72, 74-75.)

Beginning in 2002, when Student X was in kindergarten, the Department of Education continued to fund Student X's placement at a state-approved private school, but stopped recommending the at-home services.  (Id. at 75.)  Each year from 2002 to 2005, however, Plaintiff requested impartial hearings at which she successfully challenged IEPs that proposed terminating Student X's at-home services.  (Id. at 76.)  Student X continued to receive five hours of speech and language therapy and ten hours of ABA at home each week, in addition to the services Student X received at school.  (Id. at 76, 11.)

At the 2005 impartial hearing regarding services for the 2005-2006 school year, IHO Dora Lassinger noted that "The CSE acknowledges that [Student X] requires services at home, as a supplement to his school day, in order to make appropriate progress."  (IHO Hr'g Ex. D at 2 (IHO's Findings of Fact and Decision, No. 59176 (June 24, 2005)) ("IHO Lassinger Dec.").)  IHO Lassinger found that "[t]he uncontradicted testimony . . . established that in addition to the non-public school recommended in his IEP, [Student X] requires at home services of ABA therapy with a SEIT [Special Education Itinerant Teacher], for 10 hours per week, and Speech and Language Therapy for five hours per week in order to make educational progress."  (Id. at

4.)  The Department of Education did not appeal this decision.  (Mayerson Aff. Ex. D (Apr. 22, 2008) (IHO Cohen Interim Ord. (Sept. 21, 2006).)

### A.  The March IEP

In March 2006, the CSE convened for an annual review and to develop Student X's IEP for the 2006-2007 school year.  (March IEP.)  The resultant IEP noted that Student X was "progressing at a nice rate."  (Id. at 3.)  The IEP provided for Student X to continue in the approved private school and continue to receive ABA and speech and language therapy during the school day, but it made no mention of at-home services.  (Id. at 9A.)  Plaintiff agreed that Student X should attend the private school and receive services there, but requested an impartial hearing to challenge the IEP's failure to provide at-home speech and language therapy and ABA. (IHO Hr'g Ex. A at 1.)

### B.  Impartial Hearing and Decision Challenging the March IEP

An impartial hearing commenced before IHO Diane R. Cohen and testimony was presented on September 19 and 27, 2006.  Plaintiff's position was that the at-home services were "necessary in order for [Student X] to generalize the skills he learned in school to his home and to his community."  (Tr. IHO Hr'g 5.)  Without the additional at-home services, she contended that "her son's progress would be so trivial as to be almost non-measurable."  (Id.)  Plaintiff presented three additional witnesses who testified about Student X's need for at-home services: Bella Tichkova, a special education teacher who had provided at-home ABA to Student X; Barbara Offenbacher, Student X's at-home speech and language therapist; and Gila Rechany, the educational director of the state-approved school.

The school district's position was that the ABA and speech therapy provided at the school during the school day were "adequate to meet [Student X's] needs."  (Id. at 6.)  The

school district's representative did not present any witnesses or cross-examine Plaintiff's witnesses, nor did she present any evidence challenging the appropriateness and necessity of the home-based services for Student X.

i. **Testimony at the Impartial Hearing**

Plaintiff testified that Student X's at-home services had been terminated on August 15, 2006 and that Student X had not received at-home services since that date. (Tr. IHO Hr'g 14-15.)  Plaintiff testified that the ABA provided at school, without the supplemental at-home services, was not enough for Student X to generalize for daily living skills, such as tooth brushing, that cannot be taught in school. (Id. at 18.)  She further testified that Ms. Tichkova had accompanied Student X and his parents to events in the community, such as a birthday party, where the teacher helped modify Student X's inappropriate behavior. (Id. at 14.)  She also testified that since the at-home ABA ceased, Student X "gets very upset and cries when there is nobody there to be with him and there's [only] so much he can take from me and my husband." (Id. at 15.)  On the necessity for at-home speech and language therapy, Plaintiff testified that it helps Student X socialize. (Id. at 16.)   She testified that Student X was not getting enough speech and language therapy at school and that she was told he could not receive more than three half-hour sessions per week during school. (Id. at 17.)

The next witness, Ms. Tichkova, testified that she had known Student X since he was four or five, and during the 2005-2006 school year, she had provided him with ten hours per week of at-home ABA. (Id. at 18, 25.)  She testified that Student X had made significant progress and has "learned a lot of new skills" in the last few years, but still has "a lot of delays." (Id. at 22-23.)  When asked whether she believed that Student X needs a home ABA program, she stated, "Absolutely.  He needs a lot of structure.  If you just leave him in the house without a

teacher, he doesn't really know how to occupy himself.  He starts a lot of inappropriate behavior."  (Id. at 26.)  She further explained that continuation of such services was necessary "[b]ecause of his delays. . . . He's not really able to function independently in the house.  He needs somebody to assist him."  (Id. at 28.)  She testified that she disagreed with the school district's plan to terminate the at-home ABA, because "there are many hours after he comes from school" and that Student X would engage in self-injurious behaviors such as banging his head against the wall without "somebody there to assist him, to occupy him with activity, or to tell him, explain to him how to deal with that aggression or sometimes anxiety in a different way . . . ." (Id. at 32-33.)

The next witness was Barbara Offenbacher, Student X's at-home speech and language therapist.  She testified that she had known Student X for two and a half years.  (Id. at 37.)  In her opinion, while Student X's speech and language functioning were equivalent to the level of a two or three year old, Student X had nonetheless made "remarkable progress in light of the disabilities he is experiencing."  (Id. at 37, 41.)  She testified that two thirty-minute private sessions and one thirty-minute group session of speech and language therapy was insufficient and that without the home services, "he will not improve" and that the "status quo would remain."  (Id. at 41, 46, 47.)  She initially testified that "if our goal is to have a child meet his highest level of potential . . . this is a child who now needs to develop social language development as well."  (Id. at 44.)  Later, when asked about her use of the term "highest level of potential," she stated that the five hours per week of speech and language therapy she was providing at home were the "minimum," and "not enough" to meet his "highest level of potential."  (Id. at 54-55.)  She stated that the five hours per week of at-home therapy in addition to the therapy at school is the "minimum" to meet her goals for Student X, which are "to

approach the expressive and receptive language, the motor exercising, the articulation

functioning and now to try to introduce the pragmatic social aspects of the language." (Id.) She

stated that she believed Student X needed approximately ten hours[4] of speech therapy per week

"in order to make progress," although she also testified that he had made progress with the five

hours per week that she had been providing. (Id. at 52-54.)

The last witness, Gili Rechany, was the education director at Student X's school and had

known Student X for three years. She described Student X's academic, social, and emotional

needs, noting that Student X is "working on basic [academic] skills," that he is "unable to foster

relationships with his peers," and "unable to communicate effectively whether he wants

something from somebody." (Id. at 66.) She testified that at school, ABA is "used throughout

the day," and "the way our program is set is that the principals [sic] of applied behavior analysis

are delivered throughout the time that he is here." (Id. at 68.) She stated that because Student X

is at school for five hours per day (excluding lunchtime), he receives five hours per day of ABA.

(Id. at 68-69.)

Ms. Rechany testified that the at-home ABA and speech therapy are "necessary in order

for [Student X] to be able to maintain the skills that he is learning here" and that the

"collaboration has been very effective for us." (Id. at 67.) She testified that if Student X did not

receive services at home, "I definitely think that he would have a difficult time carrying over the

skills from one setting to another." (Id. at 68.) She stated that she does not recommend that all

students with autism receive at-home services. (Id. at 69.) When asked what it was in particular

about Student X such that he requires the services, Ms. Rechany testified that

> if the student is able to generalize information, and some of our students are able
> to through the instruction that we deliver here, there is no reason for them to

---

[4] She testified that Student X would need 30-40 minutes of "articulation," one hour of "language," and 30 minutes of "social pragmatic" therapy each day, five times per week. (Id. at 53-54.)

> receive applied behavior analysis at home because the need for carry over is not
> as crucial as with a student who is unable to generalize the information that is
> taught. [Student X] in specific, he has a hard time generalizing information from
> classroom to classroom, never mind from a different setting to another setting,
> such as the home setting. And the carry over for him is crucial for us to know is
> [sic] real, true mastery was met.

(Id. at 69-70.)

As an example of what the ABA provider successfully helped Student X generalize, she testified,

was extending one-word sentences with a "carrier phrase," for example, from "ball" to "I want

the ball." (Id. at 70.) Ms. Rechany testified that the school worked with Student X's "home

team to generalize that specific information in the same way that we taught it and it carried

over." (Id.) When asked how many hours of ABA Student X needed at home in order to

"generalize," Ms. Rechany stated that whatever he received until now "seems to be effective

because he is able to generalize that information currently." (Id. at 71.) On the necessity for at-

home speech therapy, she stated that the information provided to the school by the at-home

speech therapist "has been very effective in [Student X's] progress." (Id.)

In addition to the exhibits discussed above, Plaintiff submitted letters from Ms. Tichkova

and a pediatric neurologist.[5] (IHO Hr'g Ex. C, E.) The letter from Ms. Tichkova, which is

undated but refers to the age of the child, suggesting that it was written between February 2005

and the date of the hearing, describes Student X's delays and "challenging behaviors" and notes

that:

> [Student X] is currently receiving 10 hours a week of ABA (Applied Behavior
> Analysis) therapy at his home. Since ABA therapy was introduce[d] he made
> slow but steady progress. It is strongly recommended that [Student X] continue[]
> to receive ABA home services with the current frequency and duration, to further
> develop his cognitive, social-emotional, communication, and self-help skills.

---

[5] The parties also submitted a joint exhibit, a psycho-educational assessment of Student X dated January 11, 2005.
(IHO Hr'g Ex. a.) That was an informal assessment using the Vineland Adaptive Behavior Scale and classroom
observation to measure Student X's abilities in the areas of communication, daily living skills, and socialization.
(See id. at 1-3.)

(IHO Hr'g Ex C.)  The pediatric neurologist noted that Student X is followed by her office, listed Student X's diagnoses, and stated that "[d]ue to his underlying neurological condition, it is recommended that he receive 10 hours of additional speech therapy and 10 hours of ABA at home."  (IHO Hr'g Ex. E.)

ii. **IHO Cohen's Interim Pendency Order and Decision on the March IEP**

On September 21, 2006, in between the two days of testimony, IHO Cohen issued an "interim pendency order" reinstating Student X's at-home services pursuant to the IDEIA's pendency provisions.  (IHO Cohen Interim Ord.)  The interim order noted that "the child has been receiving services at home pursuant to the order of a hearing officer on June 24, 2005" and that the decision was unappealed and therefore "serves as the current pendency placement."  (Id.)

IHO Cohen issued her decision on October 19, 2006, finding that the parents of Student X had not shown that (1) the provision of speech and language therapy at home were necessary to generalize Student X's knowledge, (2) the services provided at school and recommended by the CSE on the IEP were not reasonably calculated to provide meaningful educational benefits, and (3) that the home-based ABA was necessary for Student X to receive a FAPE.[6]  (IHO's Findings of Fact and Dec., No. 106131 at 4-5 (Oct. 19, 2006) ("IHO Cohen Dec.").)

On the first issue of at-home speech therapy, IHO Cohen found that there was no evidence indicating that it was "necessary to generalize [Student X's] knowledge," and that "there was no evidence that the recommended speech and language services were inappropriate to meet his needs." (Id. at 5.)  IHO Cohen found that "[t]he speech/language provider testified that [Student X] needed to receive additional services to meet the highest level of his potential.

---

[6] IHO Cohen also found the letters from Ms. Tichkova and Student X's pediatric neurologist offered as exhibits insufficient to "contradict the presumption that the recommendation of the CSE is appropriate," but noted that it was not clear that the letter from the neurologist was submitted to the CSE for consideration.  (Id. at 6.)

This is not the legal standard." (Id.) She noted that in the request for a hearing, Plaintiff did not assert that the speech and language services in school did not meet Student X's needs or that the goals on the IEP were inadequate or inappropriate, and that Plaintiff "agree[d] with the recommended related services" provided at the school. (Id.)

On the second and third issues, IHO Cohen found that Plaintiff agreed with the placement at the state-approved school and "did not contest the goals or services set forth on the IEP," nor did she assert that the CSE or the school failed to provide services intended to generalize knowledge outside of the classroom. (Id.) She noted that "[t]here is evidence that it is difficult for [Student X] to generalize knowledge outside the classroom. Indeed, [Student X's] difficulty in generalizing the skills learned in school is part of the nature of his disability, and the amount and nature of expected progress must be viewed in relation to the severity and nature of the disability." (Id.) Moreover, there was "insufficient explanation of the need for ten hours or additional ABA services, or how this figure was determined." (Id.) There were no specific examples of Student X's difficulty in generalizing learning other than Ms. Recheny's testimony about generalizing "the learning of one word sentences plus a carrier phrase." (Id.)

IHO Cohen found the testimony of Plaintiff and Ms. Tichkova to indicate that "the home-based ABA services were used to provide for caretaking, rather than solely for instruction, by the teacher." (Id.) She found that:

> the provider accompanied the child and parent to birthday parties, haircutting and other events to provide some control over the child's behavior. The provider also testified that her services were necessary to occupy his time, which would otherwise be spent in meaningless or self-destructive ways. The mother testified that she had difficulty controlling [Student X], but that the provider was able to deal with him effectively.

(Id.)

IHO Cohen concluded that "It does not appear to me that these services were a necessary element in a free and appropriate public education. Rather, they were, at least in part, services which provided assistance to the parents . . . ." (Id. at 6-7.)

IHO Cohen noted that it is important for Student X's parents to develop skills so that "they are able to deal effectively with his behavior, rather than relying on the presence of an ABA provider." (Id. at 7.) She stated that "[p]arent training may be required as a service by the Department," citing regulations, and that Plaintiff's testimony "raises the issue of whether the parents require additional training in the 'necessary skills that will allow them to support the implementation of their child's individualized education program.'" (Id.) (citation omitted.)

IHO Cohen found that "despite my findings, in order to be certain that the CSE has considered the child's anticipated needs if the home-based services are discontinued, I will remand this case to the CSE to reconsider the recommended services." (Id.) IHO Cohen ordered that the five hours of speech therapy and ten hours of at-home ABA continue at the expense of the department "until the CSE reconvenes and makes a determination as to whether its prior recommendation that the child attend [the state-approved school] without these home-based services will meet the child's needs to generalize his skills, and to make progress in meeting his speech and language needs." (Id.) She also ordered the CSE to reconvene within thirty days to consider a) the letter from the neurologist and any other documents submitted by the parents, b) to consider whether additional assessments are necessary, c) to determine whether Student X requires additional speech and language therapy, d) to determine whether Student X is likely to be able to generalize his skills outside the classroom without the home-based services, e) to determine whether parent training is necessary, and f) if appropriate, to provide services which

are "reasonably calculated to ensure that an appropriate amount of generalization will occur." (Id.)

## C. The November IEP

Pursuant to IHO Cohen's decision, the CSE reconvened on November 15, 2006 and developed a new IEP for the 2006-2007 school year.[7] (SRO Ans. Ex. 1 (Jan. 10, 2007) ("November IEP").) The November IEP had no provision for the continuation of the in-home speech therapy and ABA. Id. The CSE Summary indicated that the CSE "is maintaining the level of service recommended at the March 2006 IEP." (Id. at 3.) IHO Cohen did not reconvene the impartial hearing to make any adjustment after the CSE convened.

On November 15, 2006, the Department again terminated Student X's at-home services that had been reinstated in September pursuant to IHO Cohen's Interim Order. (Pet. for Review ¶ 10 (Nov. 27, 2006).) According to the administrative record, correspondence from Defendant dated December 4, 2006, noted that Student X "continues to receive home-based ABA and speech and language therapy services, as per the student's pendency entitlement." (Def. Letter to SRO Kelly (Dec. 4, 2006) ("Def. December Letter").) It is not clear from the evidence before the court how long the at-home services were stopped between November 15 and December 4, 2006.

## D. SRO Decision on the March IEP

Plaintiff timely appealed IHO Cohen's decision to the SRO. (Pet. for Review ¶ 6.) On February 8, 2007, SRO Paul Kelly dismissed Plaintiff's appeal. (App. of a Child with a Disability, No. 06-131 (Feb. 8, 2007) ("SRO Dec.").) The SRO affirmed IHO Cohen's conclusion that the "petitioner did not demonstrate at the impartial hearing that the March 2006

---

[7] Plaintiff also pursued administrative appeals of the November IEP. On November 17, 2006, Plaintiff requested an impartial hearing. (Def. Ans. Ex. 3.) On July 12, 2007, IHO Lynne Reid-McQueen issued a decision in favor of Defendant. (Weber Decl. Ex. B (Apr. 22, 2008).) Plaintiff appealed to the SRO, and SRO Kelly affirmed the IHO's decision in an undated decision in November 2007. (Id. Ex C.) Plaintiff did not appeal the November 2007 SRO decision to a federal or state court. (Pl. Letter, Oct. 17, 2008) (Docket #36.)

IEP was not reasonably calculated to meet her son's special education needs or that the home-based ABA instruction was a necessary element of a FAPE for her son." (Id. at 6.) He agreed with the IHO's determination that "the petitioner failed to establish that home-based speech-language therapy was required in order to enable the child to generalize his knowledge." (Id.) He concluded that "an independent reading of the record reveals that during the impartial hearing, petitioner did not establish that her son was not offered a FAPE, thereby failing to sustain her burden of persuasion." (Id.)

The SRO noted that IHO Cohen's interim pendency order is "not part of the record on appeal and has not been appealed by either party." (Id. at 4.) Therefore, the SRO found, "the parties are bound by that decision." (Id.) The SRO further noted that the "[t]he IEP developed as a result of the November 2006 meeting was not in dispute during the September 2006 impartial hearing," so that "the appropriateness of the November 2006 IEP is outside the scope of review of this proceeding and is not subject to review in this decision." (Id.)

On the merits, the SRO found that "an independent reading of the record reveals that it does not contain any evaluative data to support [Plaintiff's] contention that that the child requires home-based ABA instruction as an essential component of a FAPE." (Id. at 6.) He agreed with the IHO that "despite the petitioner's contention that all of the witnesses 'unanimously agreed' that the child requires home-based ABA instruction in order to generalize skills learned in school, petitioner failed to set forth any specific examples on which she based her assertion." (Id.) He also agreed with the IHO that although home-based ABA instruction provided Plaintiff with assistance with caring for a child with a disability, Plaintiff did not demonstrate that her son required ten hours of ABA services per week in order to receive a FAPE. (See id.)

The SRO agreed with the IHO's conclusion that Plaintiff failed to meet her burden to show that the child was denied a FAPE without the provision of additional home-based speech therapy. (Id. at 6-7.) He found that Plaintiff failed to present any evidence showing that Student X required home-based speech therapy to generalize skills learned in school and "offered no documentation to support her assertion that he would regress without it." (Id. at 6-7.) He noted that "even if petitioner proved that her son required home-based speech-language therapy in order to generalize his skills across settings, the record reflects that she did not establish that respondent failed to offer the child a FAPE." (Id. at 7.) He noted that although the speech therapist testified that Student X required the additional five hours "'in order to meet his highest level of potential,' the impartial hearing officer correctly noted that this is not the legal standard in determine whether or not a FAPE was offered." (Id.)

SRO Kelly concluded that "the program proposed in the March 2006 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit" and that the district "offered the child an appropriate program for the 2006-2007 school year." Id.

## III.    DISCUSSION

Plaintiff filed a Complaint with this court on June 8, 2007, challenging the February 8, 2007 SRO decision. (Docket #1.) In her Motion for Modified *De Novo* Review and Related Injunctive, Compensatory, and Declaratory Relief, Plaintiff asks this court to 1) reverse the SRO decision dated February 8, 2007; 2) declare that as a matter of law, a final and non-appealable decision from an IHO triggers automatic and unconditional "pendency" entitlements in subsequent proceedings; 3) enforce and order DOE to recognize Student X's statutory and automatic pendency entitlements; 4) provide compensatory education relief for the pendency entitlements Student X did not receive; and 5) determine that Plaintiff is the prevailing party and

grant her leave to file an application for statutory attorneys' fees. (Docket #15.) Defendant has cross-moved for summary judgment, arguing that 1) the November IEP renders Plaintiff's case moot; 2) on the merits, the administrative decision should not be reversed; and 3) Plaintiff is not entitled to the injunctive, declaratory, and compensatory relief she seeks. (Docket #21.) Defendant also contends that since Plaintiff did not submit a statement of undisputed material facts pursuant to Local Civil Rule 56.1, or respond to Defendant's Rule 56.1 Statement , the court should "deem admitted" the facts presented in Defendant's Statement. (Def. Mem. 12) (Docket #24.)

### A. Plaintiff's Failure To Submit a Rule 56.1 Statement

Defendant urges the court to "deem admitted" the facts in its Rule 56.1 Statement accompanying its Motion for Summary Judgment, because Plaintiff did not submit a statement of undisputed material facts or respond to Defendant's Statement. See Local Civ. R. 56.1. Courts in this district have taken differing approaches to a Plaintiff's failure to submit a Rule 56.1 Statement in IDEIA actions. See K.Y. & T.Y. v. New York City Dep't of Educ., No. 07-cv-3199 (SJ), at 12 n.3 (E.D.N.Y. Jul. 2, 2008) (appeal pending) (deeming facts in defendant's 56.1 statement admitted in IDEIA action); C.B., 2005 WL 1388964 at *12 n.31 (declining to dismiss motion under IDEA where plaintiffs failed to submit a 56.1 statement because standard of review is different from that of a typical summary judgment motion). As discussed above, in an IDEIA action, the court must engage in an "independent review of the administrative record," Gagliardo, 489 F.3d at 112, and the existence of a disputed fact will not defeat the motion. See, e.g., Bedford, 2008 WL 2986408 at *9. "Though the parties [in an IDEIA action] may call the procedure 'a motion for summary judgment' . . . the procedure is in substance an appeal from an administrative determination, not a summary judgment." Lillbask, 397 F.3d at 83 n.3 (quoting

Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)).  Because the 56.1 Statement will not aid the court in its independent review of the record, the court declines to deem the facts set forth in the Defendant's 56.1 Statement admitted.  Cf. K.Y. & T.Y. at 12 n.3.

**B.  Mootness**

Defendant argues that Plaintiff's motion is now moot because the March IEP challenged in this case was superseded by the November IEP.  (Def.  Mem. 12-13) (Docket #24.)   Plaintiff argues that 1) her appeal of the SRO's February 8, 2007 decision affirming the March 2006 IEP is not moot, and 2) that Student X's pendency entitlements were improperly terminated prior to a final determination by this court on the merits and thus her claim for compensatory education presents a live dispute that defeats a mootness challenge.  For the reasons that follow, the court finds that the case is not moot.

"A party seeking to have a case dismissed as moot bears a heavy burden."  Lillbask, 397 F.3d at 84 (citing United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).  There is no question that "Article III of the Constitution limits federal 'Judicial Power,' that is, federal-court jurisdiction, to 'Cases' and 'Controversies.'"  Id. (citing United States Parole Comm'n v. Geraghty, 445 U.S. 388, 295 (1980)).  A case becomes moot and must be dismissed when the issues in dispute between the parties "are no longer 'live.'"  Id. (internal citations omitted).  The dispute underpinning a complaint "must persist throughout the litigation" and "if the dispute should dissolve at any time due to a change in circumstances, the case becomes moot." Russman v. Bd. of Educ., 260 F.3d 114, 118 (2d Cir. 2001).   A case also becomes moot when a court's decision can no longer affect the rights of litigants in the case before them and simply would be "an opinion advising what the law would be upon a hypothetical state of facts."  North Carolina v. Rice, 404 U.S. 244, 246 (1971) (internal quotation marks omitted).

### i. **Appeal of the SRO's Decision Affirming the March IEP**

The question before the court is whether the creation of a later IEP pursuant to an IHO's order moots a challenge to an earlier, substantively identical IEP for the same school year. Plaintiff seeks to challenge the adequacy of the March IEP, affirmed by IHO Cohen in October 2006 and SRO Kelly in February 2007. In proceedings concurrent to this litigation, she has also challenged the November 2006 IEP through the two-tier administrative process but has not sought judicial review. See supra n.7. Defendant contends that the November IEP supersedes the IEP challenged in this suit and thus moots the instant appeal by rendering the first IEP a "nullity." Regardless of whether the March IEP was superseded by the November IEP, the court finds that the challenge to the SRO's February 2007 is not moot because the challenged action is "capable of repetition, yet evading review."

Cases that are "capable of repetition, yet evading review" provide an exception to the general rule regarding mootness dismissals. Lillbask, 397 F.3d at 85 (citing Murphy v. Hunt, 455 U.S. 478, 482 (1982)). That exception applies in "exceptional situations" where two circumstances are "simultaneously present": 1) the challenged action is "in its duration too short to be fully litigated prior to its cessation or expiration," and 2) "there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." Id. (internal quotation marks and citations omitted). In Rowley, the Supreme Court noted that judicial review of IEP challenges "invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings." 458 U.S. at 186 n.9 (upholding district court's decision to retain jurisdiction "because the alleged deficiencies in the IEP were capable of repetition as to the parties before it yet evading review.").

In <u>Lillbask</u>, the Second Circuit found that a challenge to an IEP was moot where the IEP was created seven years prior to the appeal but never implemented.  <u>See</u> <u>Lillbask</u>, 397 F.3d.  The IEP at issue had recommended transferring the child out of public school, but at the time of the Second Circuit appeal, the student had never actually been transferred and the defendants "now acknowledge[d]" that the public schools "represent an appropriate placement" for the child.  <u>Id</u>. at 84.  The court noted that in the seven years since the challenged IEP was formulated, the child had advanced from grade to grade with his non-disabled peers in the public schools and "continues to be successful in his program."  <u>Id</u>. at 87.  The defendants had "dutifully complied over the years with the IDEA's stay-put provision and the district court's preliminary injunction maintaining Lindsey in the Redding public schools," and they "expressly represented to this court that they have no present intent to remove Lindsey from his mainstream educational environment" in public school.  <u>Id</u>. at 87-88.

The court in <u>Lillbask</u> determined that the situation did not satisfy the two factors for whether the challenged conduct was "capable of repetition, yet evading review."   The court suggested, but did not explicitly find, that the facts did not satisfy the first mootness factor, which is whether the challenged action is "in its duration too short to be fully litigated prior to its cessation or expiration," because the facts so clearly did not meet the second factor, whether there was a "reasonable expectation" that the challenged conduct would happen again.  <u>See id</u>. at 85-86.  Applying the analysis that the Supreme Court set forth in <u>Honig v. Doe</u> as to whether there was a "reasonable likelihood" that the challenged exclusion from public school would recur, the Second Circuit concluded that nothing in the nature of the student's disabilities suggested that the defendants would likely recommend his removal from public school and that

the defendants represented that they do not intend to remove him from public school.  See id. at 86-87.

Here, the duration of the March IEP was certainly too short to be fully litigated either before its scheduled expiration or by when the substantively identical November IEP was issued for the same school year.  The Second Circuit has noted that the Supreme Court's decision in Rowley has "prompted a number of circuits to conclude that IEP disputes likely satisfy the first factor for avoiding mootness dismissals."  Lillbask, 397 F.3d at 85 (citing cases); see also Rome Sch. Comm. v. Mrs. B, 247 F.3d 29, 31 (1st Cir. 2001) (noting that controversies regarding an IEP "are likely to evade review because the 'administrative and judicial review of an IEP is "ponderous" and usually will not be complete until a year after the IEP has expired'") (quoting Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1041 (5th Cir. 1989) (internal quotation omitted); Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1403 (9th Cir. 1994) (noting that conflict was "likely to evade review since the nine-month school year will not provide enough time for judicial review.").

The Second Circuit acknowledged that it "suggested that the age of the disabled child *might be relevant* to the application of the first mootness factor," with the example of Christopher P. v. Marcus, where the prospect of a claim evading review was unlikely for an adolescent child who had many years of eligibility remaining and who could thus "file suit in the district court immediately" upon any repeat violations.  Lillbask, 397 F.3d at 85 (emphasis added); Christopher P. v. Marcus, 915 F.2d 794, 803 (2d Cir. 1990), cert. denied, 498 U.S. 1123 (1991).   In Christopher P., however, it was clear that there was no longer a case or controversy between the parties, because the district court had dismissed the damage action on qualified

immunity grounds and the student was no longer attending the school in question, so the chance that the same complaining party would be subjected to the same action again was unlikely.  Id.

The facts of this case differ significantly from those in Christopher P. and Lillbask, because the challenged conduct has already recurred, which satisfies the second mootness factor. To avoid a mootness dismissal, a "reasonable expectation" of repetition must be more than "a mere physical or theoretical possibility."  Hunt, 455 U.S. at 482; Dennin v. Conn. Interscholastic Athletic Conf., Inc., 94 F.3d 96, 101 (2d Cir. 1996) ("[M]ere speculation that the parties will be involved in a dispute over the same issue does not rise to the level of a reasonable expectation or demonstrated probability of recurrence.") (internal quotation marks and citation omitted).  In this case, the challenged conduct has already recurred – the November IEP was substantively identical to the March IEP in that it did not provide for any at-home services.

Defendant has consistently pursued the position that at-home services are not necessary for Student X to receive a FAPE, and has vigorously defended both the March and November IEPs in the state administrative proceedings.  Given the diverging views between the parties, plaintiff has a reasonable expectation of confronting this controversy every year that Student X is eligible for public education.  Cf.  Lillbask, 397 F.3d at 88 (distinguishing the facts in that case from those in Daniel R.R., 874 F.2d at 1040-41, where the parents and school officials had "irreconcilable views" such that the challenged conduct fit into the "capable of repetition yet evading review" exception to mootness).  Moreover, as discussed below, Plaintiff challenges Defendant's termination of the at-home services prior to a ruling from this court on the merits as a violation of the IDEIA's pendency provisions.

This case thus presents an entirely different factual scenario from Lillbask, in which the defendant school district never implemented the challenged IEP and changed its position over

the seven intervening years so that the school district and plaintiff ultimately agreed on the correct placement of the student. Lillbask, 379 F.3d 92 (noting that the decision to vacate the district court opinion is informed by "our recognition that our mootness analysis relies, in no small part, on both defendants' conduct since the district court lifted its stay-put order . . . and their representations on appeal regarding Lindsey's continued appropriate placement in the Redding public schools."). The court concludes that Plaintiff's challenge to the SRO hearing affirming the March IEP is not moot because it is "capable of repetition, yet evading review."

### ii. **Claims for Relief Pursuant to IDEIA's Pendency Entitlement**

Independent of the Plaintiff's claim for review of the administrative decisions on the merits, this case presents a live controversy because Plaintiff seeks injunctive and declaratory relief and compensatory education benefits arising out of Student X's statutory pendency entitlements. (Compl.; Pl. Mot.)

Defendant argues that because it provided the home-based services until March 1, 2007, the court has no remedy to grant in this action. (Def. Mem. 13) (Docket #21.) Plaintiff's position is that the pendency entitlement flows from IHO Lassinger's June 24, 2005 unappealed decision, and that Student X should continue to receive the at-home services pending a final determination from this court on the merits. While the parties dispute Student X's pendency placement, Plaintiff's claims for injunctive and declaratory relief concerning Student X's pendency entitlements pending this court's determination on the merits are justiciable.

While Second Circuit noted in Lillbask that it has not addressed the question of mootness in the context of claims for compensatory education, several circuits have concluded that a claim for compensatory education or reimbursement can defeat a mootness challenge. Lillbask, 397 F.3d at 90. The First Circuit has concluded that "[t]he presence of an actionable claim for

compensatory education will insulate an IDEA case against a mootness challenge even after the child's eligibility for special education services ends." Id. (citing Main Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R, 321 F.3d 9, 18 (1st Cir. 2003)).   The Eighth and Ninth Circuits are in agreement.  Id.  (citing Indep. Sch. Dist. No. 284 v. A.C., 258 F.3d 769, 774 (8th Cir. 2001) (holding that compensatory education claim is not moot, because the "claim in this case concerns obligations the District allegedly had in the past and failed to meet" and because "the remedy sought is compensatory"); Wartenburg, 59 F.3d at 890.

Unlike the plaintiff in Lillbask, whose complaint did not seek compensatory relief and who failed to "plainly assert" a compensatory education claim until oral argument before the Second Circuit, 397 F.3d at 90-91, Plaintiff has sought compensatory relief in her Complaint. (Compl. 9-10) (requesting "an award in plaintiffs' favor for appropriate reimbursement and/or compensatory relief" and an order that the defendant "provide Student, as and for compensatory education, with any pendency services that Student was entitled to, but failed to receive"). Accordingly, Plaintiff's claim for compensatory relief is justiciable.

### C. Adequacy of the March IEP

In evaluating the adequacy of an IEP, the court must assess (1) whether the state complied with the procedural requirements of the IDEIA, and (2) whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." P. v. Newington Bd. of Educ., --- F.3d ----, 2008 WL 4509089, at *6 (2d Cir. Oct. 9, 2008) (citing Rowley, 458 U.S. at 206-207).

### i. Compliance with Procedural Requirements

Plaintiff appears to raise a procedural challenge to the March IEP, noting that Defendant failed to provide her with any meaningful parent training and counseling as mandated by New

York State Regulations.  (Pl. Mem. 2 (Docket #15), citing N.Y. Comp. Codes R. & Regs. tit. 8, §

200.13(d); Compl. ¶ 27 (alleging "material procedural and substantive violations in the IEP

development process.").)  To the extent that Plaintiff claims a procedural violation of the IDEIA,

this claim must be dismissed for failure to exhaust administrative remedies, because Plaintiff did

not allege any procedural violations in the administrative proceedings.  Polera v. Bd. of Educ.,

288 F.3d 478, 483 (2d Cir. 2002) (holding that failure to exhaust administrative remedies under

IDEA deprives court of subject matter jurisdiction); Garro v. Dep't of Educ., 23 F.3d 734, 737

(2d Cir. 1994) (finding failure to exhaust administrative remedies where plaintiff did not raise,

and hearing officer did not consider, alleged procedural violations of IDEA).

Plaintiff's request for an impartial hearing to review the March IEP stated that the

Defendant failed to offer Student X a FAPE "on procedural as well as substantive grounds," but

did not specify any alleged procedural violations.  (Pl. Req. for Impartial Hr'g (Aug. 24, 2006).)

Neither Plaintiff nor her witnesses testified at the impartial hearing about any procedural

inadequacies of the March IEP.  Following IHO Cohen's decision, Plaintiff did not allege any

procedural violations in her petition for review before the SRO, and the SRO did not consider or

make any determinations about the procedural adequacy of the March IEP.  (See Pet. for

Review; SRO Dec.)  Therefore, to the extent that Plaintiff raises a claim for a procedural

violation in her Complaint and Motion, such a claim has not been administratively exhausted and

that the court lacks subject-matter jurisdiction to review it.  See Polera, 288 F.3d at 483, Garro,

23 F.3d at 737.

### ii.  Substantive Adequacy to Provide Student X with an FAPE

In challenging the substantive adequacy of the March IEP, Plaintiff contends that 1) the

IHO and SRO erred by ignoring IHO Lassinger's unappealed finding and the CSE's admission in

2005 that Student X required at-home services to make appropriate progress for the 2005-2006 school year, and that 2) the IHO and SRO erred by ignoring the clear weight of the evidence confirming Student X's difficulties and his continued need for the at-home services. In its Cross-Motion, Defendant contends that it offered Student X a FAPE and that Student X does not require the at-home services to receive a FAPE. The court finds, based on its independent review of the record and additional evidence submitted by the parties, that Plaintiff has not met her burden to show that the March IEP has not provided Student X with a FAPE.

As to Plaintiff's first contention, services found to be appropriate for a student during one school year are not necessarily appropriate for the student during a subsequent school year. See M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 67 (2d Cir. 2000). In M.C. v. Voluntown, the Second Circuit noted that in evaluating the adequacy of the student's ninth grade IEP, the school district's failure to offer the student an appropriate placement for eighth grade "makes no difference to the required analysis." Id. The court noted that "[s]ince the IDEA requires a child's IEP Team to formulate a new IEP at least every year, see 20 U.S.C. § 1414(d)(4)(A)(i), the adequacy *vel non* of an IEP . . . is to be judged on its own terms."[8] Id. Although the record demonstrates that Student X needed the at-home services for the 2005-2006 school year in order to receive a FAPE, and that evidence was before IHO Cohen and SRO Kelly in their review of the March IEP for 2006-2007, such evidence does not change Plaintiff's burden to show that the March IEP was not reasonably calculated to provide Student X with a FAPE. Schaffer, 546 U.S. at 57-58.

As to Plaintiff's second contention, the court finds, based on its independent review of the administrative record and additional evidence submitted by the parties, that Plaintiff has not

[8] The 2004 revisions of the IDEIA provide for a "pilot program" for states to provide proposals to have "multi-year" IEPs lasting as long as three years, but Student X's IEP was not part of such a program. See 20 U.S.C. § 1414(d)(5)(A).

met her burden of persuasion to show that the March IEP is inadequate to provide Student X

with a FAPE. Plaintiff's only dispute with the March IEP is that it fails to provide supplemental,

at-home services for Student X, specifically, ten hours of ABA and five hours of speech and

language therapy per week.[9] (Pl. Req. for Impartial Hr'g.) The court notes that although

Defendant did not cross-examine Plaintiff's witnesses or present any rebuttal evidence at the

impartial hearing, Plaintiff had the burden of persuasion. After reviewing the entire

administrative record and additional exhibits, the court finds that the evidence, though

uncontradicted, nevertheless fails to persuade the court that the at-home ABA and speech and

language therapy are required to provide a FAPE, especially in light of the "due weight" to the

administrative proceedings that the case law requires. Walczak, 142 F.3d at 129.

### 1. At-home ABA

Plaintiff contends that at-home ABA is necessary for Student X to generalize his skills

learned in school. While the record amply demonstrates that Student X has difficulty

generalizing information, the inquiry under the statute and case law is whether Plaintiff has met

her burden of persuasion that the March IEP is not "reasonably calculated to enable the child to

receive educational benefits," that is, whether it is adequate to allow Student X to "progress, not

regress" and enjoy an opportunity "greater than mere trivial advancement." Walczak, 142 F.3d

at 130. The IDEIA requires that the student receive a "basic floor of opportunity," not "provide

the optimal level of services, or even a level that would confer additional benefits." Cerra, 427

F.3d at 195 (citation omitted). Applying that standard to the record below, the court cannot

---

[9] The IDEIA and regulations specifically allow for supplemental services as part of special education. See 34 C.F.R. § 300.39(a) (defining "special education" under the IDEIA as "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including (i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings . . . .").

conclude that the administrative decisions to uphold the March IEP deprived Student X of a "basic floor of opportunity" or was likely to cause him to regress.

At the impartial hearing, while Plaintiff presented uncontradicted testimony that the ABA is helpful, the testimony that Student X needed at-home ABA in addition to the ABA at school in order to make progress was conclusory, and testimony that Student X would regress or make only trivial progress without the at-home services was speculative. For example, Plaintiff testified that ABA during the school day was "not enough" for Student X to generalize his daily living skills, and Ms. Tichkova testified that Student X "probably . . . would be functioning at a different level" if he did not get at-home ABA. (Tr. IHO Hr'g 18, 32-33.) But Ms. Tichkova did not explain why the ABA provided during school would be insufficient, other than that Student X would resort to inappropriate behaviors after school: "[H]e has a lot of delays in many areas, so it's not sufficient at this point. And at home, there are many hours after he comes home from school and if the child doesn't have anything to do with himself, it's going to increase his self-stimulation, it's going to increase his self-injurious behaviors."[10] (Id. at 32-33.) Similarly, Ms. Rechany did not offer any support for her assertion that if Student X did not receive that at-home ABA, "I definitely think that he would have a difficult time carrying over the skills from one setting to another." (Id. at 68.) The only specific example of how the at-home ABA helped Student X generalize information learned during school was Ms. Rechany's example of extending one-word sentences with a "carrier phrase." (Id. at 70.) While the evidence demonstrates that Student X made progress with the at-home ABA, it does not persuade the court

---

[10] Other testimony at the impartial hearing suggested that the at-home ABA helped Student X from engaging in inappropriate or self-injurious behavior during the "many hours" after school. (See Tr. IHO Hr'g 14-15; 26, 32-33). The IHO and SRO found that these services were "at least in part, services which provided assistance to the parents" and were used for "caretaking, rather than solely for instruction, by the teacher." (IHO Cohen Dec. 6-7; SRO Dec. 6.) The court does not agree with or defer to the finding that the services were used for "caretaking," especially as the March IEP sets forth multiple goals related to Student X's behavior outside of school. (See March IEP at 9A.) However, the inquiry under the statute is not how the services were used by the parents, but whether such services are necessary for Student X to receive a FAPE.

that without it, Student X would regress or that his "progress would be so trivial as to be almost non-measurable," as Plaintiff testified.[11]  (Id. at 5.)

As for the amount of at-home ABA that Plaintiff contends is required, the evidence does not explain why Student X would require ten hours per week, other than that he had previously received that amount.  Ms. Rechany testified that the amount of at-home ABA that Student X had been receiving was "effective because he is able to generalize that information currently." (Id. at 71.)  The letter from the pediatric neurologist offered no explanation in support of its recommendation of ten hours of ABA "due to [Student X's] underlying neurological condition." (IHO Hr'g Ex. E.)  Similarly, Ms. Tichkova's letter provided no explanation for its recommendation of at-home ABA "with the current frequency and duration."  (IHO Hr'g Ex. C.) The IHO found, and the SRO affirmed, that there was "insufficient explanation of the need for ten hours or additional ABA services, or how this figure was determined."  (IHO Cohen Dec. 6; see SRO Dec. 6.)  While Plaintiff contends that ten hours per week is the amount of at-home ABA found necessary in IHO Lassinger's decision for the 2005-2006 school year, the court finds that Plaintiff did not demonstrate that such an amount was necessary for Student X to make progress in the 2006-2007 school year.

### 2.  At-home Speech and Language Therapy

Plaintiff also contends that the March IEP failed to offer Student X a FAPE because it did not provide five hours per week of at-home speech and language therapy.  Based on an independent review of the record, the court finds that although the at-home speech and language

---

[11] Plaintiff compares this case to D.F. v. Ramapo Cent. School Dist., 348 F. Supp. 2d 92, 96 (S.D.N.Y. 2004), vacated on other grounds, 430 F.3d 595 (2d Cir. 2005), in which the district court found that an autistic child who had not previously received at-home ABA needed ten hours per week of at-home ABA in order to make progress. The district court noted that "[t]he documentary and oral evidence presented to the court shows that all the people who examined or worked with [the student] for a significant period of time felt that [the student] needed some amount of at-home instruction."  Id.  That case was pre-Schaffer, however, so the burden was on the school district to show that the IEP was adequate, not on the parents to show that the IEP was inadequate.

therapy helped Student X generalize skills learned in school, it is not a necessary component of a FAPE, because Plaintiff did not demonstrate that the amount of speech and language therapy in the March IEP was inadequate for Student X to receive a FAPE.

The testimony and evidence offered to demonstrate the necessity of the at-home speech and language therapy for Student X to generalize knowledge learned at school and make progress was conclusory and unsupported. For example, although Ms. Rechany testified that the at-home services are necessary for Student X to maintain the skills he is learning, and that the at-home speech therapist's communication with the school was effective in determining what Student X was not generalizing in the home, see Tr. IHO Hr'g 67-68, she did not offer any evidence in support of her assertion that such services were necessary. Although her testimony runs counter to the IHO and SRO's conclusion that that there was "no evidence" indicating that the at-home speech and language therapy was necessary to generalize Student X's knowledge, see IHO Cohen Dec. 5; SRO Dec. 6, it still does not support the assertion that Student X would fail to make progress with the amount of speech and language therapy provided in the March IEP.  Similarly, Ms. Offenbacher testified that without the at-home services, "he will not improve" and "the status quo would remain," but did not offer any basis for her opinion.  (Tr. IHO Hr'g 41, 46, 47.)

In addition, while Ms. Offenbacher's testimony was more nuanced than the IHO and SRO Decisions acknowledge, see IHO Cohen Dec. 5, SRO Dec. 7, the court finds her testimony ultimately inconclusive on what quantity of services Student X needs in order to progress.  While the IHO and SRO seized on the "highest level of potential" language in the testimony, which they correctly note is not the legal standard, see IHO Cohen Dec. 5, SRO Dec. 7, the record shows that Ms. Offenbacher used that phrase to refer to the need for Student X's social language

development, not the amount of therapy required. (Tr. IHO Hr'g 44.) When pressed to clarify her testimony, however, Ms. Offenbacher testified that Student X needs ten hours of speech and language therapy per week "in order to make progress," though she also testified that he had made progress with five hours per week. (Id. at 52-54.) Later, she testified that five hours of at-home therapy were the "minimum," and were "not enough" to meet Student X's "highest level of potential." (Id. at 54-55.) In any event, Ms. Offenbacher's testimony is conclusory and is unsupported by additional explanation. The only other evidence Plaintiff offered on the amount of speech and therapy needed was the letter from the pediatric neurologist stating that Student X needs ten hours per week "due to his underlying neurological condition." (IHO Hr'g Ex. E.)

Based on an independent review of the record, the evidence does not persuade the court that the amount of speech and language therapy in the March 2006 was inadequate to provide Student X with a FAPE, given the "substantial deference" that this court must give to "administrative bodies on matters of educational policy." Cerra, 427 F.3d at 191.

The record shows that Student X had been making significant progress with the at-home ABA and speech and language therapy that had been found necessary in previous school years. (See, e.g., March IEP (Student X was "progressing at a nice rate.").) But the practical effect of Schaffer v. Weast, at least in administrative proceedings prior to the 2007 revision of the New York Education Law, see supra n.2, is that Defendant does not have the burden of justifying why it changed its position on the amount of services required when it issued the March IEP. While the March IEP must still be "reasonably calculated" to provide Student X with a FAPE in order to satisfy the requirements of the IDEIA, the burden is on Plaintiff to show that it is inadequate. Given that the IDEIA requires an IEP that is "likely to produce progress, not regression" and afford an opportunity greater than "trivial advancement," the court finds that Plaintiff has not

shown that the March IEP failed to provide Student X with a FAPE. <u>Rowley</u>, 458 U.S. at 199;

<u>Cerra</u>, 427 F.3d at 195 (quoting <u>Walczak</u>, 142 F.3d at 130).

           D. **Student X's Pendency Entitlement During the Instant Appeal**

        The IDEIA's pendency or "stay-put" provision provides that "during the pendency of any

proceedings conducted pursuant to this section, unless the State or local educational agency and

the parents otherwise agree, the child shall remain in the then-current educational placement of

such child." 20 U.S.C. § 1415(j); 34 C.F.R. § 518(a) (2007); N.Y. Educ. Law 4404(4)(a). The

Supreme Court has recognized that the language of the pendency provision is "unequivocal" and

that the statute "means what it says." <u>Honig</u>, 484 U.S. at 323, 325. Accordingly, the statute

serves as an "automatic preliminary injunction" that "substitutes an absolute rule in favor of the

status quo . . . ." <u>Zvi D. v. Ambach</u>, 694 F.2d 904, 906 (2d Cir. 1982). Claims under the

pendency provision are evaluated independently from claims pursuant to the inadequacy of an

IEP. <u>See</u> <u>Mackey</u>, 386 F.3d at 160-61 (noting that the stay-put provision represents "Congress'

policy choice that all handicapped children, *regardless of whether their case is meritorious or*

*not*, are to remain in their current educational placement until the dispute with regard to their

placement is ultimately resolved.") (internal quotation marks and citation omitted). For the

reasons discussed below, the court concludes that Student X's pendency placement was

established by IHO Cohen's unappealed decision establishing the at-home services for the 2005-

2006 school year, and that placement was changed when Plaintiff failed to appeal the November

2007 SRO decision on the November IEP. That is, Student X was entitled to receive the at-home

services until March 31, 2008, and Defendant's wrongful termination of the services more than a

year before that date violates the pendency provisions of the IDEIA and the New York Education

Law.

Under the IDEIA, the inquiry begins with the determination of the "then-current" educational placement. Zvi D., 694 F.2d at 906. Although not defined by the statute, the phrase "then-current placement" has been found to mean "the last agreed upon placement at the moment when the due process proceeding is commenced." Arlington Cent. Sch. Dist. v. L.P., 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006) (citing Murphy v. Arlington Cent. Bd. of Educ., 86 F. Supp. 2d 354, 359 (S.D.N.Y. 2000), aff'd 297 F.3d 195 (2002)). Courts have interpreted this to mean that "[i]n most cases, the pendency placement will be the last unchallenged IEP." Id. The regulations explicitly state that the pendency placement extends through administrative *and* judicial proceedings. [12] 34 C.F.R. § 300.518(a) (2007) ("[D]uring the pendency of any administrative or judicial proceeding . . . unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.").

Once a pendency placement has been established, the regulations provide that it can only be changed in one of four ways: (1) by an agreement of the parties, 20 U.S.C. § 1415(j); 34 § C.F.R. § 300.518(a); (2) by an unappealed administrative decision, 34 C.F.R. § 300.514(a); L.P., 421 F. Supp. at 696; (3) by a decision of a state review officer that agrees with the child's parents that a change in placement is appropriate, 34 C.F.R. § 518(d); or (4) by determination by a court on appeal from an SRO's decision. See id.; Bd. of Educ. v. Schutz, 290 F.3d 476, 484 (2d Cir. 2002).

### i. The Pendency Entitlement When This Lawsuit Commenced

Plaintiff's present action challenges the adequacy of the March IEP. When that IEP was proposed, Student X was receiving fifteen hours per week of at-home services pursuant to IHO

---

[12] The version of the regulation in effect when IHO Lassinger issued her June 2005 decision similarly provided for the "pendency of any administrative or judicial proceeding." See 34 C.F.R. § 300.514(a) (2004).

Lassinger's 2005 decision. (IHO Lassinger Dec.) Defendant did not appeal this decision. (See Cohen Interim Ord.) The IDEIA's implementing regulations provide that a decision made in an administrative hearing pursuant to the regulations is final, except that any party may appeal the decision. See 34 C.F.R. § 300.514(a). Because Defendant did not appeal the IHO's 2005 decision, it became Student X's final educational placement for the 2005-2006 school year. That was the last educational placement about which the Defendant and Plaintiff agreed when Plaintiff challenged the March IEP. See 20 U.S.C. § 1415(j). Therefore, the 2005-2006 placement constitutes Student X's pendency placement at the time the lawsuit was filed.

Defendant contends that the SRO's February 8, 2007 decision in favor of Defendant constitutes an "agreement" between the parents and the agency that changes Student X's pendency placement during the subsequent judicial appeal pursuant to 34 C.F.R. § 300.518(a) and (d). (Def. Mem. 21-22) (Docket #23.) The court finds this argument without merit. Section 300.518(a) provides that "during the pendency of any administrative or judicial proceeding . . . unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement." Section 300.518(d) provides that "[i]f the hearing officer in a due process hearing conducted by . . . a State review official in an administrative appeal *agrees with the child's parents that a change of placement is appropriate*, that placement must be treated as an agreement between the State and the parents . . . ." 34 C.F.R. § 300.514(d) (emphasis added). This language is not ambiguous. On the set of facts before this court, it is clear that the SRO's decision did not agree with the child's parents about the adequacy of the March IEP.

In support of its argument, Defendant has provided a letter from the Department of Education's Office of Special Education Programs ("OSEP") that provides "informal guidance"

36

on comments that appeared in the Federal Register with modifications to the language in 34

C.F.R. § 300.514(d) as it applied to states such as New York with two-tier administrative review.

(Weber Decl. Ex. D (Apr. 22, 2008) (Letter from Patricia J. Guard, Acting Director of the Office

of Special Educ. Programs to Michael D. Hampden (Sept. 4, 2007)) ("OSEP letter").)  The OSEP

letter discusses 34 C.F.R. § 300.518(a) and (d) and notes that "neither of these provisions

address[es] a situation in a State that has a two-tier due process system, in which a local agency

does not appeal a first-tier due process officer's decision on the merits *that is favorable to the*

*parent*."  (Id. at 1-2) (emphasis added).  The letter states that "[u]nder 34 CFR § 300.514(a), an

unappealed decision is final, and must be implemented.  That final decision on the merits, as

implemented, becomes the child's current educational placement."  (Id. at 2.) The letter thus

provides that Section 300.514(a), not 300.514(d), is the provision that addresses the situation in

this case – an unappealed decision by an IHO in favor of the parents.  (Id.)

Defendant seeks to rely, however, on an inapposite portion of the OSEP letter addressing

the situation of when the local agency – not the parents as in this case – challenges an IEP:

> *The same decision rules apply if it is the local agency requesting the change in placement.*  If the hearing officer agrees with the local agency, in a two-tier system, and the parent does not appeal the decision, the placement is determined by the hearing decision.  If the parent appeals the decision, the child's placement at the time the first-tier hearing was requested is the child's placement until the result of the appeal.  *Once the second-tier placement decision is made, that placement becomes the child's placement during any subsequent judicial appeals*.

Id. at 2 (emphasis added).  It was Plaintiff, not Defendant, who sought to change the placement

proposed in the March IEP by initiating administrative proceedings.[13]  Therefore, that portion of

---

[13] The court construes the "requesting a change in placement" language to refer to an attempt to change a placement through administrative proceedings.  That the March IEP failed to provide for previously provided at-home services does not constitute "requesting a change in placement."  That IEP is a new proposed placement that Plaintiff, not the agency, seeks to challenge.

the OSEP letter is inapposite.[14]  It does not change the court's conclusion that IHO Cohen's unappealed decision determined Student X's pendency placement when this lawsuit was commenced.

## ii.  **Plaintiff's Failure To Appeal the November 2007 SRO Decision**

After Plaintiff filed suit to challenge the March IEP, she continued to appeal the November IEP through the administrative process.  (See supra n.7.)  After the SRO issued a decision on the November IEP, however, Plaintiff did not continue her challenge to that IEP in federal or state court.  Although the March IEP and November IEP are substantively identical and concern the same school year, the court is bound by the federal regulations, which provide in Section 300.514(a) that an unappealed administrative decision is a final decision.  34 C.F.R. § 300.514(a).  Therefore, Student X's pendency placement changed once the time to appeal the November 2007 SRO decision ended on March 31, 2008.[15]  Because Defendants stopped and re-started Student X's at-home services at several points during the administrative appeals of the March IEP and ultimately terminated Student X's at-home services on March 1, 2007, months

---

[14] Even if the court were to consider the OSEP letter's interpretation of the regulations where the local agency requests a change in a child's placement, however, deference would not be warranted, because the letter is in direct conflict with the clear text of 34 C.F.R. § 300.518(d).  An agency's interpretation of its own regulation is entitled to deference "only when the language of the regulation is ambiguous."  Christensen v. Harris County, 529 U.S. 576, 587 (2000); Riverkeeper, Inc. v. U.S. E.P.A., 475 F.3d 83, 117 (2d Cir. 2007).  The text of 34 C.F.R. § 300.518(d) is clear that a change is warranted when the state hearing officer "agrees with the child's parents that a change of placement is appropriate."  34 C.F.R. § 300.518(d).  The text in the OSEP letter provides for a change in pendency placement "during any subsequent judicial appeals" without specifying whether the SRO agrees with the child's parents.  (See OSEP letter 2.)  "Implicit in the rule that an agency cannot interpret a regulation contrary to its unambiguous meaning is the requirement that 'an agency must adhere to its own rules and regulations.'" Riverkeeper, 475 F.3d at 117 (quoting Reuters Ltd. v. FCC, 781 F.2d 946, 950 (D.C. Cir. 1986)).  Therefore, even if that portion of the OSEP letter applied to this case, deference to OSEP's interpretation would be unwarranted.

[15] The IDEIA provides that a party has ninety days to commence an appeal from a hearing decision, unless the state has extended the statute of limitations for bringing such appeals.  20 U.S.C. § 1415(i)(2)(B).  Because New York law provides that parties to a state administrative hearing have four months to appeal a decision, N.Y. Educ. Law. § 4404(3)(a), the statute of limitations for bringing IDEIA appeals in federal court in New York is extended from ninety days to four months.  See, e.g., J.G. v. Bd. of Educ., No. 07-CV-7245 (KMK), 2008 WL 3843523, at *2 (S.D.N.Y. Aug. 14, 2008); see also Adler v. Educ. Dep't, 760 F.2d 454, 459 (2d Cir. 1985) ("[W]here a federal statute provides that suit may be brought in both federal and state court, there is something to be said for having the same statute of limitations applicable in both, at least to avoid forum shopping by prospective plaintiffs.").  Because the SRO's November 2007 Decision is undated, see Weber Decl. Ex. C, the court construes the statute of limitations to be four months after the last day of November 2007.

before the IHO and SRO even issued decisions on the November IEP, see supra n.7, Defendant

violated the pendency provisions in the IDEIA and New York Education Law.

The Second Circuit has considered the effect of a subsequent IEP on a student's

pendency placement. In Board of Education v. Schutz, which concerned parents' reimbursement

for private school tuition for their child with disabilities, the Second Circuit held that a new IEP

for the school year following the one at issue in the litigation was a "mere proposal" that did not

change the student's pendency entitlement. Shutz, 290 F.3d at 483. To hold otherwise would

"undermine entirely the pendency placement provisions of the IDEA, allowing a school district

to avoid altogether § 1415(j) by the mere proposal of a new IEP." Id. The court explicitly noted,

however, that a *new* pendency placement could be established by an administrative decision

which the parents did not appeal. Id. at 484. The court did not require the defendant school

district to reimburse the Shutzes for the remainder of the child's education, but only to fund the

placement "until a new placement is established by either an actual agreement between the

parents and the District, or by an administrative decision upholding the District's proposed

placement which [the Schutzes] choose not to appeal, or by a court . . . ." Id. at 484 (internal

quotation marks and citations omitted). That is precisely the case here – the November 2007

SRO decision is an administrative decision which Plaintiff did not appeal.

This case presents a unique situation of two substantively identical IEPs for the same

school year, both of which Plaintiff appealed separately through the administrative process, but

only one of which she appealed to a court. This court has determined that Plaintiff's challenge to

the merits of the March IEP is not moot because it is "capable of repetition, yet evading review";

that is, this court has still reached a decision on the merits of the March IEP despite a "final"

administrative decision on the substantively identical November IEP. To hold otherwise would

deprive the Plaintiffs on an opportunity to challenge the March IEP on the merits. But reaching the merits of an IEP that would otherwise evade review does not mean that the court can ignore the regulations and the language in <u>Shutz</u> regarding a change in the pendency placement.

To ignore the effect of the unappealed November 2007 SRO decision on Student X's pendency placement while Plaintiff is still substantively litigating the matter of at-home services for the 2006-2007 school year would impose a "same school year" exception: a court could ignore the effect of an unappealed administrative decision on the pendency placement while the parties are still litigating a separate IEP for the same school year.[16] Given the regulations and case law articulated in <u>Shutz</u>, however, the court concludes that it cannot ignore the effect of Plaintiff's failure to appeal the November 2007 SRO decision on Student X's pendency placement, and thus Student X's entitlement to the at-home services changed after Plaintiff's time to appeal the November 2007 decision elapsed.

In sum, because Defendant did not appeal IHO Lassinger's decision for the 2005-2006 school year, that decision became a final decision on the merits under 34 C.F.R. § 300.514(a) and constituted Student X's pendency placement at the time this lawsuit was filed. However, Plaintiff later failed to appeal the November 2007 SRO Decision finding that at-home services were unnecessary. While that decision does not affect this court's review of the merits of the March IEP, it nevertheless changes Student X's pendency placement. <u>Shutz</u>, 290 F.3d at 484. Therefore, Defendant was in violation of the IDEIA and the New York Education Law's pendency provisions when it failed to provide Student X with the at-home services from March

---

[16] The court notes that Defendant had argued in the administrative proceedings that the November IEP was unappealable because "the parents had already substantively litigated the matter of a home-based program for the child for the current school year . . . ." (Weber Decl. Ex. B (Apr. 22, 2008)) (Docket #23.)

1, 2007 until March 31, 2008, as well as intervals in 2006 when Defendant intermittently stopped and started the at-home services.[17]

### E. Remedy

Plaintiff is entitled to a remedy for Defendant's violation of the statutory pendency entitlement. While it is too late for an injunction requiring Defendant to reinstate the at-home services until a decision from this court on the merits, as Plaintiff requested in her Motion, Plaintiff also seeks compensatory education in the form of at-home services for Student X to which he was entitled but did not receive.[18] For the reasons discussed below, the court awards Plaintiff compensatory education for the at-home services that Defendant unlawfully failed to provide from March 1, 2007 until March 31, 2008, when Student X's pendency entitlement changed.

The IDEIA provides that courts "shall grant the relief that the court determines to be appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3). The Supreme Court has interpreted the statute to "confer[] broad discretion on the court" in fashioning relief. <u>See Burlington Sch. Comm. v. Dep't of Educ.</u>, 471 U.S. 359, 369 (1985) (holding that the statute authorizes reimbursement and noting that "[t]he type of relief is not further specified, except that it must be appropriate."). Compensatory education is "prospective equitable relief" that requires a school district to fund education "as a remedy for any earlier deprivations in the child's education." <u>Somoza v. New York City Dept. of Educ.</u>, 538 F.3d 106, 109 n.2 (2d Cir. 2008)

---

[17] According to evidence before the court, the at-home services were stopped between August 15, 2006 and September 21, 2006 (Tr. IHO Hr'g 14-15; IHO Cohen Interim Ord.); and between November 15, 2006 and sometime prior to December 4, 2006 (Pet. for Review ¶ 10; Def. Dec. Letter.).

[18] In her Complaint and Motion, Plaintiff seeks an order that Defendant "reimburse and fund the additional services Student previously had been receiving," but Plaintiff has not specified anywhere in her pleadings, nor has she indicated in the record or at oral argument, that she privately funded any at-home services after they were terminated by Defendant. (Pl. Compl. 9-10; Pl. Not. of Mot. 2; Tr. Oral Arg. (July 31, 2008) (Docket #34.).) Given the lack of evidence that Plaintiff resumed at-home services for Student X at her own expense, the court construes her Motion as requesting only compensatory education, not reimbursement.

(citing Burr v. Sobol, 888 F.2d 258 (2d Cir.1989), aff'g prior holding in Burr v. Ambach, 863 F.2d 1071 (2d Cir. 1988)).

Defendant argues that Student X is not eligible for compensatory education relief because 1) Student X is under age twenty-one; 2) Plaintiff has not demonstrated a "gross" violation of the IDEIA; and 3) Plaintiff has not exhausted administrative remedies with respect to her claim for compensatory education. The court addresses these arguments in turn and finds the first two without merit, and agrees with the third only with respect to the at-home services that were unlawfully terminated prior to the SRO's February 8, 2007 decision.

First, Student X's age does not preclude an award of education. In P. v. Newington Board of Education, the Second Circuit recently affirmed a hearing officer's award of compensatory education to a student who was eight years old at the time of the statutory violation. 2008 WL 4509089 at *10. The court noted that "[t]he IDEA allows a hearing officer to fashion an appropriate remedy, and we have held compensatory education is an available option under the Act to make up for denial of a free and appropriate public education." Id. That earlier cases found that courts may award compensatory education for individuals over age twenty-one, see, e.g., Mrs. C. v. Wheaton, 916 F.2d 69, 75-76 (2d Cir. 1990), does not preclude such an award for students under age twenty-one.

Second, regardless of whether a gross violation of the IDEIA is required to merit compensatory education, Defendant's unlawful termination of Student X's pendency entitlement is nonetheless such a violation. Prior to P. v. Newington, the Second Circuit cases concerning compensatory education were brought on behalf of students age twenty-one or older and required a "gross" violation of the IDEIA to merit an award of compensatory education. See, e.g., Garro, 23 F.3d at 737; Somoza, 538 F.3d at 109 n.2. As discussed above, P. v. Newington affirmed

compensatory education for student who was eight years old at the time of the violation; that decision did not mention what level of violation is necessary to merit compensatory education. 2008 WL 4509089 at *10.  The district court in that case had explicitly "disagreed" with the argument that compensatory education is warranted only if there is a gross violation, noting that "[t]he requirement of a gross violation before any relief can be granted has been applied only to cases involving claimants over the age of 21."  P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89, 112 n.13 (D. Conn. 2007), aff'd 2008 WL 4509089.

Even assuming that a gross violation is required, the court finds that Defendant's violation of the statutory pendency provision was a gross violation.  The Second Circuit caselaw on what constitutes a gross violation is sparse.  In Garro, the court found that "unspecified procedural violations" did not suffice.  See 23 F.3d at 737.  Burr found a gross violation in the undue delay in an agency hearing and administrative review that resulted in the child being deprived of the benefit of the statutory pendency provision and excluded from school.  863 F.2d at 1075-76.  The court noted that the child was "denied an appropriate education during pendency of the proceedings, the precise unfortunate result that the 'stay-put' provision was designed to prevent."  Id. at 1076.

Here, while Student X was not completely deprived of all education, he nonetheless experienced, for more than a year, the "precise unfortunate result" that the pendency provision was designed to prevent.  Defendant disregarded the "automatic injunction" and "absolute rule in favor of the status quo" mandated by the IDEIA, Zvi D., 694 F.2d at 906, and wrongfully terminated Student X's at-home services months before Plaintiff commenced her timely appeal to this court, and more than a year before Plaintiff was required to file a judicial appeal of the November IEP.  As discussed above, the Supreme Court has warned that the statutory language

is "unequivocal" and that the statute "means what it says." Honig, 484 U.S. at 323, 325. The pendency provision represents "Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." See Mackey, 386 F.3d at 160-61 (internal quotation marks and citation omitted). Defendant ignored the plain language of the statute and regulations and deprived Student X of services to which Student X was unequivocally entitled regardless of the merits of his case. The court finds this a gross violation of the IDEIA.

Lastly, Plaintiff failed to exhaust administrative remedies only for the compensatory education claims she could have brought in the administrative proceedings below. As discussed above, Defendant intermittently stopped the at-home services for several weeks during the fall of 2006. See supra n.17. Given that the services stopped and started on several occasions while the administrative proceedings were still pending, Plaintiff understandably sought reinstatement on a prospective basis rather than compensatory education to make up for the services Student X had already missed. Because the IDEIA requires exhaustion of administrative claims, see, e.g., Garro, 23 F.3d at 737, to the extent that Plaintiff could have sought compensatory education in the administrative proceedings for the services wrongfully terminated in the fall of 2006, she is barred from doing so.

Plaintiff's claim for compensatory education for the services terminated on March 1, 2007, however, are not barred for failure to exhaust, as Defendant's unlawful conduct occurred *after* both the IHO and SRO issued decisions on the adequacy of the March IEP. Plaintiff cannot be required to have exhausted a claim that did not yet exist at the time of the administrative

hearings.  Therefore, education is warranted for the services that Student X was entitled to, but did not receive, from March 1, 2007 to March 31, 2008.

As for the amount and nature of compensatory education that the court awards Student X, the Second Circuit has not articulated a test for determining how such awards are calculated. See, e.g., P. v. Newington, 2008 WL 4509089 at *10 (affirming compensatory education as appropriate without discussion of how award was calculated); Burr, 888 F.2d 258, aff'g prior holding in 863 F.2d at 1078 (allowing student over age twenty-one to remain in private school at state expense for one and a half years as compensatory education for the amount of time the student was denied placement at the school)).  The Supreme Court has emphasized that IDEIA relief depends on "equitable considerations."  Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15-16 (1993); Burlington, 471 U.S. at 374.  "Unlike ordinary IEPs that need only provide "'some benefit,' compensatory awards must do more – they must *compensate*."  Reid v. Dist. of Columbia, 401 F.3d 516, 525 (D.C. Cir. 2005).

Defendant was obligated by statute and regulations to provide the at-home services until Student X's pendency placement changed, regardless of whether Plaintiff ultimately demonstrated that the services were necessary to provide a FAPE.  See Mackey, 386 F.3d at 160-61.  To allow a school district to unilaterally terminate rights to which a student is automatically and unconditionally entitled would eviscerate the Supreme Court's admonition that the pendency provision in the statute "means what it says."  Honig, 484 U.S. at 325.  Like the court in Burr, which affirmed an award of compensatory education equal to the amount of time that the student was denied placement at his school, see 888 F.2d 258, aff'g prior holding in 863 F.2d 1071, the court awards Plaintiff compensatory relief identical to the at-home services Student X should have received as his pendency entitlement.  Defendant  is ordered to fund and provide ten hours

per week of at-home ABA and five hours per week of speech and language therapy, for fifty-seven weeks, the amount of time that Student X was unlawfully deprived of the services from March 1, 2007 to March 31, 2008.

F. **Prevailing Party Status**

Plaintiff seeks a declaration from the court that she is the prevailing party for purposes of seeking attorneys' fees. The IDEIA authorizes an award of attorney's fees "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). The Supreme Court has defined a "prevailing party" as "one who has been awarded some relief by the court." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 603 (2001). Prevailing party status is conferred by a judgment on the merits or a settlement agreement expressly enforced by the court, id. at 603, or a "'court ordered chang[e][in] the legal relationship between [the plaintiff] and the defendant' or a 'material alteration of the legal relationship of the parties.'" Pres. Coal. of Erie County v. Fed. Transit Admin., 356 F.3d 444, 452 (2d Cir. 2004) (quoting Buckhannon, 532 U.S. at 604) (internal citations omitted).

In measuring a party's degree of success, the Supreme Court and the Second Circuit have interpreted the prevailing party standard generously; a party need not prevail on all issues. See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989); G.M. v. New Britain Bd. of Ed., 173 F.3d 77, 81 (2d Cir. 1999). "Plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." G.M., 173 F.3d at 81 (quoting Texas State Teachers Ass'n, 489 U.S. at 789 (internal citation omitted)). A "purely technical or de minimis" victory, however, will not qualify a plaintiff as a prevailing party. Texas State Teachers Ass'n, 489 U.S. at 792. At a minimum, a plaintiff "must be able to point to

a resolution of the dispute which changes the legal relationship between itself and the defendant." Id. "A plaintiff may be considered a prevailing party even though the relief ultimately obtained is not identical to the relief demanded in the complaint, provided the relief obtained is of the same general type." G.M., 173 F.3d at 81 (quoting Koster v. Perales, 903 F.2d 131, 134-35 (2d Cir. 1990)). "The most critical factor is the degree of success obtained." Id. (quoting Texas State Teachers Ass'n, 489 U.S. at 789.) The same standards apply in IDEIA cases. J.C. v. Reg'l Sch. Dist. 10, 278 F.3d 119, 124 (2d Cir. 2002).

Plaintiff did not succeed in reversing the administrative decisions on the adequacy of the March IEP, but prevailed on her pendency claim for which she obtained compensatory education. This partial victory meets the generous standard set by the Supreme Court, because the court's determination of what placement constitutes Student X's pendency entitlement and award of compensatory education materially alters the legal relationship between the parties. While a preliminary injunction requiring the school to maintain a student's pendency placement without consideration of the merits does not give rise to prevailing party status, see Christopher P. v. Marcus, 915 F.2d 794 (2d Cir. 1990), a substantive determination of which educational placement should be applied to determine the pendency placement has been found to merit an award of fees. K.R. v. Board of Educ. of Brentwood Union Free Sch. Dist., 66 F. Supp. 2d 444, 450 (E.D.N.Y. 1999). In K.R., the court noted that attorneys' fees were not warranted for "mere preservation of the status quo to avoid immediate, irreparable injury, such as the grant of a TRO." Id. (citing Haley v. Pataki, 106 F.3d 478, 483 (2d Cir.1997)); Christopher P., 915 F.2d at 804-05. The court found, however, that "[a]lthough enforcement of the IDEA's stay-put provision ordinarily amounts to no more than preservation of the status quo, where the petition also seeks a 'substantive determination of which educational placement should be applied under

the stay-put provision,' the petitioner has requested relief on the merits." K.R., 66 F. Supp. at 450 (citation omitted). The court analyzed the relief sought and the relief obtained by the plaintiff in her petition for stay-put orders and noted that the plaintiff "sought and obtained a determination of [the student's] proper pendency placement under the IDEA's stay-put provision. She also sought and obtained enforcement of her rights under the stay-put provision." Id. Disputed in K.Y. was which classroom placement was the appropriate pendency placement. See id. The court found that "because the plaintiff 'successfully enforce[d] . . . her rights under the IDEA, the statute authorizes [the court] to award reasonable attorney fees." Id. (citing G.M., 173 F.3d at 80). The court finds the analysis in K.R. persuasive. Here, Plaintiff did not seek merely to maintain the status quo, but litigated a substantive dispute over which placement applied. Therefore, the court declares Plaintiff the prevailing party with respect to the pendency and compensatory education claims and grants leave to file an application for partial attorneys' fees. See Hensley v. Eckerhart, 461 U.S. 424, 435-37 (1983) (holding district court has discretion to reduce award of fees to account for party's partial success).

IV.    **Conclusion**

    For the reasons discussed above, the court grants in part and denies in part the parties' cross-motions. The court concludes that the March IEP was substantively adequate under the IDIEA to provide Student X with a FAPE, but that Defendant unlawfully terminated Student X's pendency entitlement under the statute. As a matter of law, Student X's pendency placement when this lawsuit commenced was determined by the unappealed IHO decision in 2005. This remained Student X's pendency placement until Plaintiff failed to appeal the November 2007 SRO Decision. Defendant is ordered to provide fifty-seven weeks of compensatory education in the form of ten hours per week of at-home ABA and five hours per week of at-home speech and language therapy for Student X. Plaintiff's success on the pendency and compensatory

education claims makes her the prevailing party, and the court grants her leave to file an

application for partial attorneys' fees.

SO ORDERED.

                                                      /s/ Nicholas G. Garaufis
Dated: Brooklyn, New York                           NICHOLAS G. GARAUFIS
       October 30, 2008                             United States District Judge